| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | **FILED**<br>JAMES J. WALDRON, CLERK<br><br>June 21, 2016<br><br>U.S. BANKRUPTCY COURT<br>NEWARK, N.J.<br><br>BY: MARGARET COHEN, DEPUTY |
|---|---|
| In re:<br><br>NEWARK WATERSHED CONSERVATION AND DEVELOPMENT CORPORATION,<br><br>Debtor. | |
| NEWARK WATERSHED CONSERVATION AND DEVELOPMENT CORPORATION,<br><br>Debtor-Plaintiff,<br>v.<br>LINDA WATKINS-BRASHEAR; DAWAYNE BRASHEAR; EDIT INTERIORS; DONALD BERNARD SR.; DONALD BERNARD SR. CONSULTING; BERNARD AND ASSOCIATES; NEW BEGINNINGS ENVIRONMENTAL LLC; EDWARD MCRAE; CLEANER-N-GREENER; GREENER-N-CLEANER; CARLOS AROCHO; AROCHO LANDSCAPING; OSCAR N. JAMES SR.; THE JAMES GROUP; JAMES C. PORTER; JIM P. ENTERPRISES, LLC; LAWRENCE BELCHER, CPA; WALTER FRYE, CPA; UNITY FINANCIAL STRATEGISTS, INC.; GARDEN STATE SECURITIES, INC.; DARNELL A. DEANS; CORY A. BOOKER; RODNEY B. JOHNSON; WILLIAM T. MERRITT; OSCAR S. JAMES II (a/k/a OSCAR JAMES, JR.); DONALD M. PAYNE, JR.; VAUGHN L. McKOY; MICHELLE THOMAS; XYZ CORPORATION 1-10 (FICTITIOUS NAMES); JOHN DOE 1-10 (FICTITIOUS NAMES),<br>Defendants. | Case No. 15-10019 (VFP)<br><br>Chapter 11<br><br>Adv. Pro. No. 15-2397 (VFP) |

# **OPINION**

**APPEARANCES:**

Wasserman, Jurista & Stolz, PC
Daniel Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Ste. 304
Basking Ridge, NJ 07920
Counsel for Debtor

Scarpone & Vargo, LLC
James A. Scarpone, Esq.
Bruce D. Vargo, Esq.
50 Park Place, Ste. 1003
Newark, NJ 07102
Special Counsel for Plaintiff

Perkins Coie LLP
Marc Elias, Esq. (*pro hac vice)*
Gary F. Eisenberg, Esq.
30 Rockefeller Plaza - 25th Fl.
New York, NY 10112
Counsel for Defendant Cory A. Booker

Sills Cummis & Gross
Jaimee Lynn Katz Sussner, Esq.
One Riverfront Plaza
Newark, NJ 07102
Counsel for Defendant Vaughn L. McKoy

**VINCENT F. PAPALIA, United States Bankruptcy Judge**

## I. INTRODUCTION

This matter is before the Court on the separate (though related) motions of Defendants Cory Booker ("Booker") and Vaughn L. McKoy ("McKoy") to dismiss the claims against them in the adversary complaint filed against them by Debtor Newark Watershed Conservation and Development Corporation ("NWCDC" or "Debtor"). The formal count against Booker and McKoy is Count Seven for "Negligence / Breach of Fiduciary Duties" (Dkt. No. 1, at 37, 42, ¶¶ 168-76). The Debtor filed an objection and cross-motion to amend the Complaint (with a proposed Amended Complaint). Booker and McKoy filed replies. For the reasons stated below, the Court will grant the motion to dismiss as to Booker based on public employee immunity and deny the motion to dismiss as to McKoy based on charitable immunity and N.J.S.A. § 15A:6-14. The Debtor's cross-motion to amend is granted.

## II. JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on October 17, 2013. Venue is proper in this Court under 28 U.S.C. § 1408. Whether the Complaint (which includes a jury demand) is a core proceeding under 28 U.S.C. § 157(b)(2) is an issue under consideration by the

District Court, as Booker filed a motion under 28 U.S.C. § 157(d) to withdraw the reference on December 1, 2015 with the District Court under Dkt. No. 15-cv-08393 (KSH). McKoy joined in that motion, which remains pending.

> Under FED. R. BANKR. P. 5011(c) the pendency of a motion to withdraw the reference:
>
> shall not stay the administration of the case or any proceeding therein before the bankruptcy judge except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of the motion.

FED. R. BANKR. P. 5011(c). No party has applied to this Court to stay these motions in the face of the pending motion to withdraw the reference. To the contrary, at oral argument, Booker's counsel acknowledged that the filing of this motion is a deemed consent to this Court's jurisdiction to decide the motion. Counsel for the Debtor concurred and no objection was interposed by McKoy.

Accordingly, the Court will proceed to decide the motion and issue the following findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## III. STATEMENT OF FACTS

### A. The NWCDC

As alleged in the Complaint, the Debtor was created in 1973 under a Newark Municipal Council ordinance to manage Newark's "fresh water properties" in Morris, Passaic and Sussex Counties (Dkt. No. 1, ¶ 3). Debtor is incorporated as a nonprofit corporation under N.J.S.A. § 15A:1-1 *et seq.* ("New Jersey Nonprofit Corporation Act") (*Id.* ¶ 4). Debtor's duties were expanded in 1998 to managing Newark's Pequannock water treatment facility and in 2009 to managing Newark's water storage reservoirs (*Id.* ¶ 3). The Debtor operated pursuant to service contracts with Newark. *Id.* According to the Complaint, the NWCDC "operated nearly entirely via funding by the taxpayers of the City [of Newark] and, from 2008 to 2011, was paid more than $40.5 million by Newark under two contracts in

effect during that period. *Id. at* ¶ 61. Debtor is subject to a Charter and Bylaws last amended in 1994 (Dkt. No. 1, ¶ 5; Dkt. No. 25-2, Elias Decl., Exs. A and B).

Under the 1994 *Amended Certificate of Incorporation* the Debtor was governed by a Board of Trustees consisting of seven (7) to eleven (11) individuals:

> The Mayor, ex-officio, two members of the Newark Municipal Council selected by that body, and up to eight others but not less than four appointed by the Mayor with the advice of the Board of Trustees and the advice and consent of the Newark Municipal Council. Each Trustee will serve the term of office of the Mayor and council appointing him and until the appointment and qualification of a successor.

(Dkt. 25-2, Elias Decl., Ex. A, 8) (emphasis supplied). Defendant Booker served as Mayor of Newark from July 1, 2006 through October 30, 2013 and was therefore an *ex officio* member of Debtor's Board during that period (Dkt. No. 1, ¶ 37; Dkt. No. 25-5). Defendant McKoy served on the Board from 2007 to 2011 "without compensation or any other economic benefit from any source" (Dkt. No. 39-3, McKoy Decl., ¶ 2).

### B. <u>The Hog Wild and Comptroller's Reports</u>

According to the Complaint, a citizens' group commissioned an investigative report, issued in January 2011,[1] of the Debtor's conduct of its affairs that has become known as the "Hog Wild Report." (Dkt. No. 1, ¶¶ 68-69, Ex. A, and at 7, 11). In January 2011, the New Jersey Comptroller began an investigation of the NWCDC and issued preliminary findings in early 2013 (Dkt. No. 1, ¶¶ 71-73 and Ex. B at 4). At an emergency meeting of March 25, 2013, the Board voted to dissolve the Debtor (Dkt. No. 1, ¶ 73). On application by the City of Newark, the Superior Court of New Jersey entered an Order appointing four (4) provisional trustees (Dkt. No. 1, ¶ 73).

The New Jersey Comptroller issued his report on February 19, 2014 (Dkt. No. 1, ¶ 74 and Ex. B) (the "2014 Report"). The 2014 Report largely affirmed and expanded upon the assertions made in the

---

[1] It appears that the January 2011 date of the Hog Wild Report is a typographical error since it refers to NWCDC board minutes through March of 2011 (Ex. A at 7) and correspondence from Watkins-Brashear dated February 7, 2011 (*Id*. at 11). Thus, the Report appears to have been issued after January 2011.

Hog Wild Report. The 2014 Report found significant improprieties by the Debtor's Executive Director and others. More specifically, the 2014 Report found that "from 2008 to 2011, the NWCDC recklessly and improperly spent millions of dollars of public funds *with little or no oversight by the Board of Trustees or the City*." See 2014 Report at 1 (emphasis supplied). The 2014 Report also indicates that the Booker administration proposed creating a Municipal Utilities Authority ("MUA") to replace or to supplement the work of the Debtor (Dkt. No. 1, Ex. B, at 22-23). Debtor alleges that this proposal, and the money expended to explore its feasibility (approximately $1 million), exceeded the Debtor's authority and results in Booker, McKoy and others becoming liable to the Debtor. (Dkt. No. 1, Compl. ¶¶ 115-35).

**C. The Bankruptcy Filing and this Adversary Proceeding**

The nonoperating Debtor filed a voluntary Chapter 11 petition on January 2, 2015. The Debtor filed this seven-count adversary Complaint on November 6, 2015 against twenty-eight (28) defendants, individuals and entities. The Complaint includes many of the same allegations as the 2014 Report, which is incorporated into the Complaint, as is the Hog Wild Report.

In the Complaint, the Debtor classified the Defendants into four categories: (1) officers, employees and contractors who received financial benefit from the mismanagement of Debtor; (2) professionals whose negligence promoted the bad conduct of management and the pursuit of the unauthorized MUA; (3) trustees who profited from the mismanagement of Debtor or who failed to fulfill their fiduciary duty; and (4) trustees who were negligent and/or breached their fiduciary duties to Debtor without any allegation that they received any benefits from the Debtor (Dkt. No. 1, ¶ 1). Booker and McKoy fall into the fourth category and are the subject of one count, Count 7, of the Complaint (along with five (5) other Board members) for negligence and breach of fiduciary duty.

Count 7 alleges in pertinent part:

> 169. Pursuant to N.J.S.A. § 15A:6-14 the members of the NWCDC Board were obligated to discharge their duties in good faith and with the degree of

> diligence, care and skill which ordinary, prudent persons would exercise under the circumstances. . . .
>
> 172. As outlined above, [Booker and McKoy] knew or should have known of the misappropriation of funds and waste of NWCDC assets and funds by [Executive Director] Watkins-Brashear, and should have acted to prevent or stop it.
>
> 173. As outlined above, [Booker and McKoy] knew or should have known of the contractual limitations placed on the NWCDC pursuant to its contracts with the City and knew or should have known that those contractual limitations did not permit the NWCDC to use and thus waste the funding provided by the City to pursue the issue of an MUA.

(Dkt. No. 1, Compl. ¶¶ 169, 172-73). Count 7 seeks compensatory and punitive damages in unstated amount, fees, costs and prejudgment interest.

## IV. ARGUMENTS OF PARTIES

In his motion to dismiss, Booker argues that:

(1) as a public employee, he has absolute statutory immunity under N.J.S.A. § 59:3-2(a) and (b) for his *ex officio* role with the Debtor, a role which derived from his public duties as Mayor, for actions (or inactions) that were discretionary, legislative or required the exercise of judgment (Dkt. No. 25, at 10).

(2) even if he were not a public employee with respect to the Debtor, he would still have immunity under the Tort Claims Act as an "employee" of an entity with a governmental function (Dkt. No. 25, at 11).

(3) N.J.S.A. § 15A:6-14, *infra*, which Debtor alleges at Complaint ¶ 169 is the basis for Booker's liability, actually shields him from liability if, "acting in good faith," he relies on opinion of corporation counsel, independently prepared financial data, or financial reports represented to be true by the president, person in charge of the books or person presiding at a meeting (referred to in this Opinion as "Safe Harbor 1") (Dkt. No. 25, at 14). Booker argues that, besides failing to allege bad faith by Booker, the facts as alleged by the Debtor support Booker's immunity under this statute and militate in favor of dismissal under FED. R. CIV. P. 12(b)(6).

(4) Debtor's recurring allegations that Booker's actions violated certain "contractual limitations" and/or that the Board acted beyond its "mandate" fail to meet either the notice-pleading standard under FED. R. CIV. P. 8(a)(2) or the plausibility standard under FED. R. CIV. P. 12(b)(6) (Dkt. No. 25, at 19). See, e.g., Compl. ¶¶ 126, 173. Without knowing what these contracts are, Booker argues that he cannot respond to the Complaint. Debtor attempts to cure this asserted defect in its objection and cross-motion (Dkt. No. 47-3, at 8) by identifying certain contracts in its proposed Amended Complaint and Brief. (Dkt. No. 47-1, proposed Am. Compl., ¶¶ 116-17).

McKoy generally joins in Booker's arguments (except as to the public employee immunity), arguing that Debtor's Complaint fails to state a claim against McKoy under either of the two "safe harbor" provisions of N.J.S.A. § 15A:6-14 and should be dismissed as a matter of law under FED. R. CIV. P. 12(b)(6):

(1) (Safe Harbor 1) - N.J.S.A. § 15A:6-14 shields McKoy from liability if, "acting in good faith," he relies on opinion of corporation counsel, independently prepared financial data, or financial reports represented to be true by the president, person in charge of the books or person presiding at a meeting.

(2) (Safe Harbor 2) - N.J.S.A. § 15A:6-14 also shields a not-for-profit trustee from liability (if liability has been eliminated by the certificate of incorporation) *unless* the not-for-profit corporation operates "exclusively for religious, charitable or educational purposes" [N.J.S.A. § 2A:53A-7(a)] and the trustee is serving without compensation, in which case "the trustee shall not be personally liable to the corporation or its members for damages for breach of duty as a trustee" even if liability has *not* been written out of the certificate of incorporation.

(3) Debtor has failed to allege when McKoy acted in "bad faith" to take him outside the protection of Safe Harbor 1.

(4) Debtor has failed to meet the notice-pleading requirement of FED. R. CIV. P. 8(a)(2) by not identifying the "contractual limitations" which McKoy is alleged to have violated by any

consideration of the MUA project in his capacity as a Trustee (Dkt. No. 1, Compl. ¶ 173). Even if Debtor did identify such "contractual limitations," McKoy would be shielded by N.J.S.A. § 15A:6-14 from liability by his reliance on the opinions of professionals, particularly upon General Counsel (Safe Harbor 2). As noted above, Debtor attempts to address these asserted deficiencies by its Amended Complaint.

Debtor argues that:

(1) Booker is not entitled to the immunity afforded a public employee by the Tort Claims Act, N.J.S.A. § 59:3-2(a) [or, presumably, (b)] because the statute was meant to protect a public employee from a private suit for damages, not to protect a public employee from a claim made by a public entity. As confirmed at oral argument, this is the Debtor's *only* argument against the application of this immunity.

(2) McKoy is not entitled to Safe Harbor 2 of N.J.S.A. § 15A:6-14 because the Debtor is not an entity operating "exclusively for religious, charitable or educational purposes" as case law has interpreted N.J.S.A. § 2A:53A-7(a).

(3) Booker and McKoy cannot raise their "good faith" defense under N.J.S.A. § 15A:6-14 (Safe Harbor 1) at this time because it must be raised in an Answer and developed through discovery and/or at trial, analogizing to 42 U.S.C. § 1983 actions and related case law.

(4) Debtor responds to the Defendants' notice-pleading argument under FED. R. CIV. P. 8(a)(2) by describing the "operational contracts" which governed the Debtor from 2006 through 2012, when the Mayor allegedly had to sign an Executive Order to fund it for one more year in the face of emerging fraud allegations (Dkt. No. 47-3, at 9-15). The summary purports to demonstrate that the operational contracts contained no mandate for pursuing the MUA project.

(5) Debtor seeks leave to amend its Complaint with one "which more clearly complies with federal pleading requirements" (Dkt. No. 47-3, at 16). Debtor provided a redlined version of the proposed Amended Complaint (Dkt. No. 47-1). The additions are primarily at ¶¶ 5, 47, 116-20, 171, and 174 and identify more particularly the "operational contracts," which the Debtor argues limited the

Trustees' ability to act, and also recite the four guilty pleas to criminal charges relating to NWCDC claims that underlie the Complaint.

## V. LEGAL STANDARDS

### A. Dismissal Under FED. R. BANKR. P. 7012/FED. R. CIV. P. 12(b)(6)

FED. R. CIV. P. 12(b)(6), incorporated into FED. R. BANKR. P. 7012, allows a defendant to move to dismiss any action for failure to state a claim upon which relief can be granted by motion made before the responsive pleading is filed. FED. R. CIV. P. 12(b)(6); FED. R. BANKR. P. 7012. The Court accepts all well-pleaded allegations in the complaint as true, views them in the light most favorable to the plaintiff, and determines whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231, 234 (3d Cir. 2008). A complaint must contain sufficient factual matter which, if accepted as true, "state[s] a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556). The pleadings must raise the possibility, though not the probability, of the conduct complained of and show "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The Court undertakes a two-part analysis which requires it to: (1) identify and reject labels, conclusory allegations, and formulaic recitation of the elements of a cause of action; and then (2) draw upon its judicial experience and common sense to determine whether the factual content of a complaint plausibly gives rise to an entitlement to relief. *Iqbal*, 556 U.S. at 678-79. The Court "generally consider[s] only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" along with authenticated documents which form the basis of the

claim. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir 1993), *cert. denied*, 510 U.S. 1042 (1994).

In this case, Booker and McCoy are effectively raising their "good faith" defense in their motion to dismiss under FED. R. CIV. P. 12(b). However, by doing so at this stage of the proceedings, they are subject to the procedural and substantive limitations that are applicable on a motion to dismiss, as discussed in this section.

**B. Notice Pleading Under FED. R. BANKR. P. 7008/FED. R. CIV. P. 8(a)**

FED. R. CIV. P. 8, made applicable here by Bankruptcy Rule 7008, requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In the Third Circuit, this standard requires the pleader to allege supporting facts, "but only those necessary to provide the defendant fact notice of plaintiff's claim and the grounds upon which it rests." *In re Tower Air*, 416 F.3d 229, 237 (3d Cir. 2005). Those facts need not be alleged in great detail, as "[t]o hold otherwise [would convert] 12(b)(6) motions into multi-purpose summary judgment vehicles." *Id*. at 238.

**C. Booker's Immunity Under N.J.S.A. § 59:3-2(a) and (b)**

As set forth above, Booker argues that he has immunity from suit and from the Plaintiff's claims under the New Jersey Tort Claims Act, N.J.S.A. § 59-1 *et seq.* (the "Tort Claims Act"). More specifically, Booker claims absolute statutory immunity under N.J.S.A. § 59:3-2(a) and (b) as a public employee for his *ex officio* role with the NWCDC, a role which stemmed directly from his public duties as Mayor (Dkt. No. 25, at 15) and immunity as an "employee" of an organization which exercises a governmental function (Dkt. No. 25, at 11). Booker further asserts immunity on the ground that his function on the Board was "legislative and discretionary in nature" (Dkt. No. 25, at 17).

The NWCDC counters that Booker is not entitled to the immunity afforded a public employee by the Tort Claims Act, N.J.S.A. § 59:3-2 because the statute was meant to protect a public employee from a private suit for damages, not to protect a public employee from a suit by a public entity. As noted,

this is the NWCDC's only argument against immunity for Booker. In this regard, the NWCDC has acknowledged (as has Booker) that there are no cases directly addressing this issue.

Because there is no dispute that Booker was acting as a public employee in serving on the Board, and no argument that his actions (or inactions) as a member of the Board were other than discretionary and/or legislative in nature and required the exercise of his judgment, the Court finds that Booker is immune under N.J.S.A. § 59:3-2(a) and (b). In the Court's view, this interpretation is consistent with the plain language of the Tort Claims Act and its purposes.

**(i) <u>The Plain Language of the Tort Claims Act Supports Immunity for Booker</u>**

The plain language of the Tort Claims Act provides a public employee such as Booker with immunity for "an injury resulting from the exercise of judgment or discretion vested in" the employee, N.J.S.A. § 59:3-2(a), and "legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature." N.J.S.A. § 59:3-2(b). Here, Booker's alleged actions or inactions were taken in the exercise of "judgment or discretion" and/or were legislative in nature -- and the NWCDC does not argue otherwise. As a result, and as is described in more detail below, Booker is immune from liability for the actions or inactions alleged in the Complaint under the Tort Claims Act.

**(a) <u>The Relevant Statutory Provisions</u>**

The Court's analysis of the Tort Claims Act begins, as it must, with the plain language of that statute. *See, e.g., O'Connell v. State,* 171 N.J. 484, 488 (2002). Statutory definitions at N.J.S.A. § 59:1-3 relevant to this motion include:

> "Employee" includes an officer, employee, or servant, whether or not compensated or part-time, who is authorized to perform any act or service; provided, however, that the term does not include an independent contractor. . . .
>
> "Public employee" means an employee of a public entity . . . .
>
> "Public entity" includes the State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State.

> "State" shall mean the State and any office, department, division, bureau, board, commission or agency of the State, but shall not include any such entity which is statutorily authorized to sue and be sued. . . .

N.J.S.A. § 59:3-1.

As the Mayor of Newark, Booker is clearly a public employee. *See, e.g., Aymes v. Fried*, 2014 WL 1032341 at *3 (N.J. Super., App. Div., March 19, 2014) (mayor is entitled to immunity under N.J.S.A. § 59:3-2). There is no dispute he was acting in that capacity while serving as an *ex officio* member of the Board.

N.J.S.A. § 59:2-1 ("Immunity of public entity generally") makes liability in the public entity the exception:

> N.J.S.A. § 59:2-1. Immunity of public entity generally.
>
> a. Except as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.
>
> b. Any liability of a public entity established by this act is subject to any immunity of the public entity and is subject to any defenses that would be available to the public entity if it were a private person.

N.J.S.A. § 59:2-1 (footnote to § 59:1-1 *et seq*. omitted). The Comment encouraged a Court faced with a suit against a public entity to approach suits against public entities with the question:

> whether an immunity applies and if not, should liability attach. It is hoped that in utilizing this approach the courts will exercise restraint in the acceptance of novel causes of action against public entities.
>
> Subsection (b) is intended to insure that any immunity provisions provided in the act or by common law will prevail over the liability provisions. It is anticipated that the Courts will realistically interpret both the statutory and common law immunities in order to effectuate their intended scope.

N.J.S.A. § 59:2-1 cmt. (West 2006 and Supp. 2015) (emphasis in original).

The bases for immunity and liability of a public employee are set forth in Chapter 3 of the Tort Claims Act, specifically at N.J.S.A. § 59:3-1 ("Generally") and § 59:3-2 ("Discretionary activities"). Read in conjunction, these sections shield a public employee from most actions taken in the line of work. N.J.S.A. § 59:3-1 states in full:

> a. *Except as otherwise provided by this act*, a public employee is liable for injury caused by his act or omission to the same extent as a private person.
>
> b. The liability of a public employee established by this act is subject to any immunity of a public employee provided by law and is subject to any defenses that would be available to the public employee if he were a private person.
>
> c. A public employee is not liable for an injury *where a public entity is immune from liability for that injury*.

N.J.S.A. § 59:3-1 (emphasis supplied). N.J.S.A. § 59:3-2 states in full:

> a. A public employee is not liable for an injury resulting from the exercise *of judgment or discretion* vested in him.
>
> b. A public employee *is not liable for legislative or judicial action or inaction*, or administrative action or inaction of a legislative or judicial nature.
>
> c. A public employee is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services.
>
> d. A public employee is not liable for the exercise of discretion when, in the face of competing demands, he determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public employee was palpably unreasonable.
>
> Nothing in this section shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions**.**

N.J.S.A. § 59:3-2. N.J.S.A. § 59:3-14(a) ("Public employee immunity; exception") establishes a narrow exception to immunity:

> Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was *outside the scope of his employment* or constituted a crime, actual fraud, actual malice or willful misconduct.

N.J.S.A. § 59:3-14 (emphasis supplied).

In this case, Booker's actions or inactions as a NWCDC Board member undeniably involved the exercise of judgment or discretion and/or legislative action, N.J.S.A. § 59:3-2(a) and (b), and NWCDC understandably does not argue otherwise. For example, NWCDC's Bylaws dictate that the Board is the "policy-making body of the Corporation." NWCDC Bylaws, Art. 14, § 2. Policymaking requires the exercise of judgment, is certainly discretionary in nature and may involve legislation, particularly in Booker's case. Similarly, advocating for the creation of an MUA to replace NWCDC is discretionary, legislative and involves the exercise of judgment. Booker's role on the Board also at least arguably involved the "provision of governmental services" and "how to utilize or apply existing resources." N.J.S.A. § 59:3-2 (c) and (d). Holding Booker liable for this type of activity would potentially prevent or hinder him from doing what he was elected to do.

For example, if he believed it was in Newark's best interests to promote and create the MUA and enact related legislation to replace NWCDC, he should not be prevented or hindered from doing so because of the potential liability he faces in his *ex officio* role as a member of the NWCDC's Board, a position which he automatically assumed upon being elected. That potential liability would put Booker in an untenable position: he could not do what he thought best for Newark because he was on the Board of the entity he was seeking to replace. Liability in such circumstances is contrary to the plain language of the Act and its purposes, as well as the best interests of Booker's constituents.

The other allegations against Booker -- that he knew or should have known of Watkins-Brashear's wrongful activities and did not properly exercise his judgment and/or discharge his duty of care as a member of the Board -- also fall squarely within the immunity afforded by the Act to a public employee in exercising judgment or discretion. Thus, the immunity applies to those types of claims as well under the plain language of the Tort Claims Act and is completely consistent with its policy and purposes.

**(b) There is No Exception Under the TCA for Claims Brought by a Purportedly Public Entity**

The NWCDC's only argument against application of the Tort Claims Act in these circumstances is the Act does not apply when the claim is made by a public entity. Although the issue of whether NWCDC is a public entity was debated by the parties in their papers, the Court finds no need or basis to decide that issue on this motion to dismiss. There is no basis to decide because the record on the public/private entity issue is at best incomplete. As is noted elsewhere in the Opinion, the public/private entity question is a fact-sensitive one and, in the principal cases cited by the parties, was only decided after discovery on summary judgment or at trial. *See O'Connell v. State*, 171 N.J. 484 (2002); *Ryan v. Holy Trinity Evangelical Lutheran Church*, 175 N.J. 333 (2003); *Tonelli v. Bd. of Educ.*, 185 N.J. 438 (2005). Additionally, there is no need to decide that issue because even if the NWCDC is considered a public entity, there is no exception in the Tort Claims Act for claims by public entities and it is not in this Court's province to create one.

As was noted above, the Tort Claims Act does not exclude claims by public entities anywhere in its many provisions, even though there are various exceptions to immunity throughout. *See, e.g.*, N.J.S.A. § 59:3-14(a) (nothing in Tort Claims Act exonerates a public employee from liability for conduct outside the scope of his employment or which constitutes a crime, actual fraud or willful misconduct); N.J.S.A. § 59:9-2(d) (immunity from pain and suffering damages does not apply "in cases of permanent loss of a bodily function"). Nowhere in the Tort Claims Act are claims by public entities excluded.

NWCDC's argument that the label on "[t]he cover of the book containing the Tort Claims Act" evidences the exception that should be afforded to claims by public entities is unavailing for the same reasons and others. This argument ignores the basic principle that a statute's title cannot -- and should not -- "limit the plain meaning of the text" of the actual statute. *Brotherhood of R.R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 528-29 (1947) (where the plain text of a provision in the Interstate

Commerce Act clearly made the statute applicable to *any* proceeding filed under the Act, the Court refused to limit the application to proceeding filed before the Interstate Commerce Commission merely because "Commission" appeared in the title of the provision). *See also, e.g., In re Attorney General's Directive on Exit Polling: Media and Non-Partisan Public Interest Groups*, Issued July 18, 2007, 402 N.J. Super. 118 (App. Div. 2008), *aff'd and modified on other grounds*, 200 N.J. 283 (2009); *see also Whitfield v. United States*, 543 U.S. 209, 216 (2005) (provision in criminal code appearing under the title "penalties" could create another substantive offense and was not limited to penalties). Consistently, N.J.S.A. § 1:1-6 provides that "no outline or analysis of the contents of any title, subtitle, chapter or article . . . shall be deemed to be part of the Revised Statutes or such statute." Thus, the fact that the label on the cover of the book containing Tort Claims Act refers only to "claims AGAINST public entities or BY public entities," (Dkt. No. 47-3, Debtor Br., at 3, n.1), is simply of no moment, and certainly does not constitute sufficient authority for this Court to engraft a new exception to immunity under the Tort Claims Act.

In sum, there is no express exception to the immunity provided by the Tort Claims Act for claims brought by a public entity, and this Court will not create one. *See, e.g., O'Connell*, 171 N.J. 484, 491-92, 499 (2002) ("[I]t is not the Court's province 'to engraft exceptions onto the charitable immunity doctrine' as 'the Legislature has spoken and has directed the court to interpret the immunity liberally'"). For all of these reasons, Booker is entitled to public employee immunity and his motion to dismiss the claims against him will be granted.

**(ii) Public Employee Immunity for Booker Serves The Purposes of the Tort Claims Act**

In *Marcinczyk v. State Police Training Comm'n*, 203 N.J. 586 (2010), our Supreme Court described the principal aims of the Tort Claims Act as follows: "[1] to protect public entities and public employees from constant legal onslaught in recognition of the breadth of their public responsibilities; [2] to permit injured citizens to seek recompense from public entities for negligence in narrowly defined

circumstances; and [3] to avoid a piece-meal approach and impose some order on the subject." *Id.* at 596 [numbering added]. Further, a "guiding principle" of the Tort Claims Act is that "immunity from tort liability is the general rule and liability is the exception." *Polzo v. Cnty. of Essex*, 196 N.J. 569 (2008). *See also Brooks v. Odom*, 150 N.J. 395, 492 (1997) (purposes of Tort Claims Act was to reestablish general rule of immunity for public entities, to stabilize erosion of immunity by judicial decisions and to protect the "public coffers").

In this case, these stated purposes of the Tort Claims Act are served by limiting the liability of Booker (and Newark). As is noted by Booker: (i) his *ex officio* position on the Board results exclusively from his position as Mayor of Newark; (ii) pursuant to statute (N.J.S.A. § 40:69A-40), a Mayor in New Jersey serves as an *ex officio* member on "all supportive bodies in municipal government" as to which they are not official voting members; and (iii) the Mayor of Newark also serves as an *ex officio* board member for various mixed public/private entities. (See Dkt. No. 54, Booker Reply Br., at 3-5.) Thus, making Booker potentially liable for actions or inactions taken by these various and numerous entities would be directly contrary to many of the Act's central purposes.

First, it would fail to protect him from a legal jeopardy for his official functions and would also fail to recognize the breadth of his public responsibilities. Additionally, finding the exception to immunity urged by the NWCDC would endorse a piecemeal approach to public employee liability that would, in this Court's view, result in disorder and, more importantly, discourage public service. Third, Booker is likely to seek indemnity from Newark (in the event he has not already) for potential liability for actions that result directly and exclusively from his position as mayor. Thus, contrary to the NWCDC's arguments, Newark's coffers would likely be affected if Booker is forced to defend this suit, either directly or through the insurance premiums it is required to pay for its employees.

In sum, holding Booker immune from liability in these circumstances is consistent with the plain language of the Tort Claims Act and its purposes.[2]

### D. McKoy and Booker's Immunity Under New Jersey's Nonprofit Corporation Act, N.J.S.A. § 15A:6-14

McKoy and Booker also argue that the claims against them should be dismissed because they are immune from suit under N.J.S.A. § 15A:6-14 and that therefore the Debtor's Complaint (even as amended) fails to state a claim against them as a matter of law. Specifically, N.J.S.A. § 15A:6-14, which provides both the grounds for liability asserted by the Debtor and the two separate immunity or "Safe Harbor" defenses asserted by Booker and McKoy, states in relevant part as follows:

> Trustees and members of any committee designated by the board shall discharge their duties in *good faith and with that degree of diligence, care and skill which ordinary, prudent persons would exercise under similar circumstances in like positions*.
>
> [Safe harbor 1] In discharging their duties, trustees and members of any committee designated by the board shall not be liable if, *acting in good faith*, they rely on the opinion of counsel for the corporation or upon written reports setting forth financial data concerning the corporation and prepared by an independent public accountant or certified public accountant or firm of accountants or upon financial statements, books of account or reports of the corporation represented to them to be correct by the president, the officer of the corporation having charge of its books of account, or the person presiding at a meeting of the board.
>
> [Safe harbor 2] A trustee shall not be personally liable to the corporation or its members for damages for breach of duty as a trustee if and to the extent that such liability has been eliminated or limited by a provision in the certificate of incorporation authorized by [N.J.S.A. § 15A:2-8(c)], except that, in the case of a trustee of a corporation which is established for the purposes provided for in [N.J.S.A. § 2A:53A-7 *et seq*.] who serves without compensation, other than reimbursement for actual expenses, the trustee shall not be personally liable to the corporation or its members for damages for breach of duty as a trustee, whether or not such liability has been eliminated or limited by a provision in the certificate of incorporation authorized by [N.J.S.A. § 15A:2-8(c)].

---

[2] The other purpose of the Act -- to provide recompense from public entities for their negligence in narrowly defined circumstances -- is in no way offended by this ruling. To the contrary, as is also noted in Booker's Brief, where the Legislature sought to limit that immunity, such as cases where there was a permanent loss of bodily function, it knew how to do so. This is not one of those narrowly defined circumstances.

N.J.S.A. § 15A:6-14 (emphasis supplied; bracketed language, numbers and paragraphing added). N.J.S.A. § 15A:2-8(c) and (d) ("Certificate of incorporation") state in full:

> c. The certificate of incorporation may provide that a trustee or officer shall not be personally liable, or shall be liable only to the extent therein provided, to the corporation or its members for damages for breach of any duty owed to the corporation or its members, except that such provision shall not relieve a trustee or officer from liability for any breach of duty based upon an act or omission (1) in breach of such person's duty of loyalty to the corporation or its members, (2) not in good faith or involving a knowing violation of law or (3) resulting in receipt by such person of an improper personal benefit.
>
> d. Notwithstanding the provisions of subsection c. of this section, the immunities provided for in this 1989 amendatory act shall apply to any corporation organized under Title 15A of the New Jersey Statutes which is established for the purposes provided for in [N.J.S.A. § 2A:53A-7 *et seq*.] whether or not the certificate of incorporation has been amended, and nothing in this section shall operate to diminish or affect any limitation of liability or limitation on liability which is conferred upon nonprofit corporations, societies or associations by the provisions of [N.J.S.A. § 2A:53A-7.1].

N.J.S.A. 15A:2-8(d).[3]

Significantly, the types of nonprofit corporations and associations referred to in N.J.S.A. § 2A:53A-7 are those "organized *exclusively* for religious, charitable or educational purposes." N.J.S.A. § 2A:53A-7A (emphasis supplied). The Court will now analyze Booker and McKoy's immunity defenses under both "Safe Harbors" of N.J.S.A. § 15:6-14.[4]

### E. <u>Safe Harbor 1</u>

Safe Harbor 1 provides a defense to a trustee of a nonprofit corporation who: (i) acting in good faith; (ii) relies on the [x] opinion of counsel for the corporation; and/or (y) written financial reports of the corporation prepared by independent or certified public accountants; and/or (z) books of account or

[3] Neither party argues that they are immune based on any particular provision of the NWCDC's Certificate of Incorporation.

[4] Of course, since this Court has already determined to dismiss the claims against Booker based on public employee immunity, there is no need to specifically address Booker's additional immunity (and other) defenses here. However, since the defenses raised by McKoy and Booker (other than public employees immunity) are similar, if not identical, the Court's analysis applies to both.

reports of the corporation represented to be correct by an appropriate corporate official. In this regard, both defendants argue that the Debtor has pleaded that the Board of Trustees of the Debtor, including Booker and McKoy, "relied upon" the opinions of its counsel and financial reports prepared by NWCDC's accountants, auditors and investment advisors, and therefore satisfied the "acting in good faith" requirement. See Dkt. No. 39-2, McKoy Br., at 6, citing Compl. ¶ 82-114. However, this Court's review of the Complaint (as amended) reveals that the Debtor's allegations do not go quite that far. Instead, the Complaint alleges that the Debtor's professionals were aware or should have been aware of the wrongful activities of the Executive Director, and that they did not, at any time, object to them "or report or take any action to prevent, curtail or disclose the unlawful activities" to the Board (or anyone else). Dkt. No. 1 at ¶ 66; *see also* ¶¶ 107-08 (failure to identify unlawful activities); ¶¶ 94-101, 152, 157 and 159 (professionals "did nothing to report or stop . . . the waste and misappropriation").[5]

Thus, while plainly alleging that the professionals did not report any wrongful activities to the Board, the Complaint does not allege that the Board members relied -- properly or otherwise -- on any reports or opinions prepared by those professionals. The Debtor is entitled to test whether and to what extent there was actual reliance on the financial reports and opinions, whether that reliance was appropriate in the circumstances and what else the Board members may or may not have known during the relevant time period. *See, e.g., Francis v. United Jersey Bank*, 87 N.J. 15, 30-33, 38-39 (1981) determining scope of director's duties under virtually identical standard of care found in N.J.S.A. 14A:6-14 and noting that the director's review of financial statements may give rise to duty to inquire further). That type of information is peculiarly within the knowledge of defendants and the

[5] McKoy's Brief also indicates that the Debtor's Complaint alleges that as a result, "the Board members (other than those alleged to have conspired with Watkins-Brashear) did not receive notice of the alleged misconduct," citing ¶¶ 94-101, 152, 157 and 159. However, the language in the cited paragraphs of the Complaint again does not go quite so far. Although it is true that the allegations are that the Debtor's professionals did not give notice of the misconduct to the Board, that does not necessarily mean that Board members did not have any such notice or knowledge from other sources or that their review of the documents and opinions should not have raised any "red flags." The proof of that type of allegation would also necessarily require further factual development through discovery, as those facts are peculiarly within the knowledge of the defendant Board members.

notice-pleading requirements of this Court (discussed in more detail *infra*) do not require the Debtor to allege anything more at this stage.

Further, contrary to McKoy and Booker's arguments, the Amended Complaint does not expressly or impliedly allege that any of the Board Members, including McKoy and Booker were "acting in good faith, and with that degree of diligence, care and skill which ordinary, prudent persons would exercise in similar circumstances in like positions." In fact, the Amended Complaint alleges that Booker and McKoy failed to meet that standard in several respects (Dkt. No. 47-1, Am. Compl. at ¶¶ 171-77). The Complaint alleges that the "non-involved" Board members "knew or should have known of the misappropriation of funds and waste of NWCDC assets and funds by Watkins-Brashear, and should have acted to prevent or stop it." *Id*. at 172 and 174. Further, as is argued by NWCDC, the Board appears not to have acted with respect "to the growing chorus of public criticism of the NWCDC, the worst of which has proven to be true" until long after the Hog Wild Report was issued and the Office of the Comptroller had started its investigation. See Dkt. No. 47, Debtor's Br. 6; Compl. ¶¶ 68-71 and Ex. A.

Thus, while it is certainly true that the Complaint itself demonstrates that certain of the requirements for immunity under Safe Harbor 1 have been met, the requirements that the Board member be "acting in good faith" and rely on the reports prepared by its professionals are, by the express terms of Safe Harbor 1, additional elements that need to be proven to achieve the immunity. In other words, the fact that a Board member was provided with the opinions of counsel and reports of its financial professional is not enough. The Board members must also have relied on those reports and been "acting in good faith" in doing so to be granted the immunity. Booker and McKoy's argument that the "good faith" requirement is satisfied by the preparation of the reports and opinions of counsel that were provided to the Board and the failure of those professionals to raise any issues with the Board reads the "acting in good faith" and reliance requirements out of the statute and would render them meaningless. *D'Annunzio v. Prudential Ins. Co. of Am.*, 192 N.J. 110, 129 ("[w]hen interpreting a statute or regulation,

we endeavor to give meaning to all words and to avoid an interpretation that reduces specific language to mere surplusage"); *Brown v. Brown*, 86 N.J. 565, 577 (1981) (as a "general interpretive principle" the language of a statute is "not intended to be redundant, lead to an untoward result, or result in surplusage").

As to the relationship between the timing of these events and defendants' term of office, the Court notes that McKoy served as an uncompensated Board member from 2007 to 2011 (Dkt. No. 39-3, McKoy Decl., at ¶ 2). Booker served as Chair of the Board, but as an *ex officio* member, based entirely on his position as Mayor. Accordingly, his term on the Board commenced when he was elected Mayor in July of 2006 and ended in October of 2013, when he resigned to become a United States Senator of New Jersey (Dkt. No. 25, Booker Br., at 5).

Thus, McKoy was not a Board member when the Comptroller's 2014 Report was issued, or even when it was first "partially" leaked in 2012. But he was on the Board when the Newark Water Group began its inquiry into the affairs of the Debtor in 2010 that led to the issuance of the "Hog Wild" Report in January 2011 (or 2012). See Am. Compl., ¶¶ 68-69 and Ex. A thereto. He was also a Board member before that, starting in 2007 and continuing through 2011, when the alleged egregious misconduct began to occur with regularity. See 2014 Report at 7-10, 12-13 (from the use of manual checks by Watkins-Brashear to make payments to herself in 2008-2011, to the use of a margin account to make over 650 trades in a brokerage account from 2007 to 2010, to the payments of thousands of dollars or more on account of no-bid contracts to relatives, acquaintances and former NWCDC employees in 2008-2011 and beyond).[6] Finally, the Comptroller found in his executive summary that between 2008 and 2011 (while McKoy was a Board member), the Debtor "recklessly and improperly spent millions of

[6] The Complaint also alleges that the Board approved improper buyouts to Watkins-Brashear in 2006 and 2013. Booker was a Trustee at those times. Compl. ¶ 37 ("Booker was Mayor of the City of Newark from July 1, 2006 to October 30, [2013]"). However, as noted, McKoy was a Trustee from 2007 to 2011. McKoy Decl. at 1 ¶ 2; Compl. 1 ¶ 12. Accordingly, the 2006 and 2013 payments were not made during McKoy's term and are not attributable to McKoy, based on the allegations of the Complaint.

dollars of public funds *with little or no oversight by either its Board of Trustees or the City*." 2014 Report at 1 (emphasis supplied). As a result, this Court finds that, at this preliminary stage of the proceedings, the Debtor has set forth a plausible claim that McKoy failed to act in good faith and with the degree of care required under N.J.S.A. § 15:6-14.

In these regards, the Court notes that McKoy's Declaration states that he did not have any knowledge of the alleged misconduct and that revelations about the alleged misconduct did not surface until two years after he resigned. *Id.* ¶ 3. Putting aside the fact that a Declaration such as this is not appropriately considered on a motion to dismiss, these are precisely the type of asserted facts which are entitled to be tested by the Debtor through discovery, rather than being decided on a motion to dismiss. Eventually, McKoy's lack of knowledge of any "red flags" and/or his reliance on the reports and opinions of NWCDC's professionals may very well be determined to be the case, but that determination cannot be made on a motion to dismiss where all well-pleaded facts are asserted to be true, all inferences are to be drawn in favor of the Debtor and when the issue of good faith has been put squarely into dispute.

Additionally, that McKoy had any actual knowledge of any alleged misconduct does not necessarily end the inquiry, as the applicability of this immunity also requires determinations as to whether McKoy acted as an ordinarily prudent Trustee in similar circumstances, including whether he should have known about -- or at least raised questions as to -- any perceived irregularities, and whether he properly relied on the reports provided to him. *See, Francis*, *supra*, 87 N.J. 38-39. As was noted in *Francis*, "[t]he review of financial statements, however, may give rise to a duty to inquire further into matters revealed by those statements." *Id.* at 33. When analyzing whether these standards have been met, the particular circumstances of each case must be considered, and a heightened duty (and potential for liability) may arise where, as here, the public interest is involved. *See Francis*, 87 N.J. at 35.

At this point, it also bears noting that the list of alleged wrongful activities identified in the Complaint is long and shocking. See Compl. 14-16 and 19-21. That list is based in large part on the

2014 Report of the New Jersey State Comptroller, which is incorporated by reference into the Complaint and is cited by both Booker and McKoy. That Report includes the general finding that the Debtor -- principally through Watkins-Brashear -- "recklessly and improperly spent millions of dollars of public funds with little or no oversight by either its Board of Trustees or the City," Report at 1. Although the Report found that Watkins-Brashear undertook these wrongful activities with the Board's approval or knowledge, the Report also found that the Board failed to exercise proper oversight by failing to institute and implement appropriate policies regarding the approval of contracts and spending that could have prevented many of those acts described above. *Id.* at 2, 29-30.[7] The Complaint alleges that the Board was aware or should have been aware through reasonable diligence, of many or all of the unlawful practices of Watkins-Brashear and that it breached its duties to the Debtor by failing to investigate or determine the accuracy of the representations being made to the Board about the Debtor's financial condition or its internal controls and procedures regarding the handling of cash and cash reserves and awarding contracts. *Id.* at ¶¶ 18-49. Under New Jersey law, these failures to act may give rise to liability on the part of a director/trustee, even though the immediate cause of the loss was due to the conduct of others. *Francis*, 87 N.J. at 44 (neglect and failure to act by noninvolved director contributed to climate and continuation of corrupt actions and therefore was substantial contributing factor to plaintiff's loss).

The Complaint also alleges that the Board breached its duties by improperly pursuing the formation of a municipal utilities authority ("MUA") to perform the functions of the Debtor, as outside the scope of the Debtor's mandate and contractual obligations with the City. *See generally* Complaint at ¶¶ 48-49. In its proposed Amended Complaint and Brief, the Debtor provided additional detail about

[7] Here, the Court notes that although the 2014 Report asserts that the wrongful activities were undertaken without the Trustees' knowledge or approval, that determination (particularly as to lack of knowledge) is not binding on this Court. In fact, while the Complaint acknowledges that the wrongful activities were undertaken without the Board's approval, it does not indicate or allege that the Trustees had no knowledge of the wrongful activities. Although McKoy denies any such knowledge, the Debtor is entitled to test that denial through discovery.

the specific contracts and contractual and other limitations that the Debtor (not the Board) failed to observe. See, e.g., Am. Compl. at 116-19; Dkt. No. 47-3, Debtor's Br., at 10-14. Those allegations unquestionably provide the defendants with notice of the claims against them and are sufficient to survive a motion to dismiss.

In sum, although the issues such as: (i) whether the pursuit of the MUA was wrongful; (ii) whether Board members properly relied (or relied at all) on the reports of their professionals, (iii) whether the Trustees were "acting in good faith"; (iv) whether the reports by the Debtor's professionals (or other sources) may have raised "red flags" to a Trustee acting "with that degree of diligence, care and skill which ordinary prudent persons would exercise under similar circumstances in like positions," notwithstanding the failure of those professionals themselves to raise any such red flags; and (v) what knowledge (if any) the Trustees may have had about the wrongful activities, are certainly not being decided by the Court at this time, the Court is satisfied that for purposes of this motion to dismiss, and treating the Debtor's well-pleaded allegations as true, the Debtor's allegations state plausible claims for negligence and/or breach of fiduciary duties under New Jersey law. Accordingly, the motions to dismiss McKoy and Booker under Safe Harbor 1 must be denied at this time.

### F. <u>The "Acting in Good Faith" Requirement and the Business Judgment Rule</u>

As additional arguments in support of their motion, McKoy and Booker assert that their good faith is "presumed" under the business judgment rule, citing cases such as *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005). The Court finds *Tower Air* and other cases cited by McKoy and Booker distinguishable on procedural and substantive grounds and that, fairly read, *Tower Air* supports the denial of Booker and McKoy's motion to dismiss for the reasons stated below.

**(i) *Tower Air* Applied Delaware's Heightened Pleading Standard That is Not Applicable in Federal Court**

First, in *Tower Air*, the District Court applied Delaware's heightened state court pleading standard in dismissing plaintiff's claims, rather than the lower federal standard. In reversing the District Court's dismissal of a majority of plaintiff's claims, the Third Circuit held that the heightened "pleading facts with specificity" standard under Delaware Chancery Rule 8 "is not the federal notice pleading standard." *Id.* at 236. In fact, the Third Circuit held that the District Court "erred by assuming that Delaware's notice pleading cases are interchangeable with federal notice pleading cases. They are not." *Id.* at 237. The Circuit Court also went on to hold that "[b]y requiring the plaintiff to allege specific facts [i.e., the precise argument defendants make here], the District Court erroneously preempted discovery on certain claims by imposing a heightened pleading standard not required by [FED. R. CIV. P.] 8." *Id.*

The *Tower Air* Court went on to describe what should -- and what need not be -- alleged to survive a motion to dismiss, i.e., "supporting facts should be alleged, but only those necessary to provide the defendant fact notice of plaintiff's claim and the grounds upon which it rests." *Id., citing*, *Conley v. Gibson*, 355 U.S. 41, 47 (1957). As the Third Circuit explained in *Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004) and reiterated in *Tower Air*, a "plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts." 416 F.3d at 237. "To hold otherwise [would convert] 12(b)(6) motions into multi-purpose summary judgment vehicles." *Id.* at 238. As detailed above, the Debtor in this case has alleged various failures and inattention by the Board that plainly put defendants on notice of the Debtor's claims against them, thus satisfying the federal notice pleading standard.

**(ii) The *Tower Air* Case was Decided Under Delaware Law Which Has a More Expansive Business Judgment Rule Than New Jersey**

Next, and perhaps more significantly, the *Tower Air* case was decided under the substantive corporate law of the state of Delaware. Like the heightened pleading standard imposed by Delaware courts, Delaware corporate law also provides a stronger safe harbor for directors (and trustees) under its Business Judgment Rule than does New Jersey law. Here, the Court compares the "near-insurmountable" or "Herculean" standards established by the Delaware cases cited at p. 238 of *Tower Air* (plaintiff must show corporate waste, irrationality or that the only explanation is bad faith) to the *Francis v. United Jersey Bank* case that is still the governing standard under New Jersey law.

As noted above, the *Francis* case required far less a showing to hold a noninvolved, elderly director liable for her inattention, notwithstanding the virtually identical safe harbor provided by N.J.S.A. § 14A:6-14. More specifically, in *Francis*, the Court found an elderly director liable for the wrongful activities of two officers of the corporation who were her sons despite the fact that the director had no knowledge or involvement in the wrongful activities and did not benefit from them. There, the New Jersey Supreme Court established a much higher standard for a director (or trustee) to avoid liability for actions of the corporate officers undertaken under their watch:

> A director is not an ornament, but an essential component of corporate governance. Consequently, a director cannot protect himself behind a paper shield bearing the motto, "dummy director." The New Jersey Business Corporation Act, in imposing a standard of ordinary care on all directors, confirms that dummy, figurehead and accommodation directors are anachronisms with no place in New Jersey.

*Francis*, 87 N.J. at 26 (citations omitted). At this stage of the case, the NWCDC has satisfied its burden to state a plausible claim for breach of the duty of care imposed upon the defendants by N.J.S.A. § 15A:6-14 and the *Francis* case -- a standard that requires a significantly lesser showing than the Delaware business judgment rule relied upon by McKoy and Booker.

**(iii) *Tower Air* Reversed the District Court's 12(b)(6) Dismissal of Many Substantive Counts of the Complaint**

Next, even putting aside issues as to whose burden it is to plead and prove good faith -- or lack thereof -- the court in *Tower Air* expressly held that allegations of "inattention," "irrationality" or "gross negligence" could overcome the presumption of the business judgment rule. *Id.* at 238-39. As noted above, the inattention alleged here is summarized in the Debtor's Complaint as follows:

> • the Board was aware of or should have been aware through the exercise of reasonable due diligence of many, if not all, of the unlawful practices that Watkins-Brashear and others were engaged in and yet did nothing to stop or reduce the damage that was being done to the entity;
>
> • at no time did the Board investigate to determine the accuracy of the representations being made regarding the financial condition of the NWCDC, nor did it question the professionals about the entity's internal controls or procedures with respect to the handling of cash reserves and the awarding of no-bid contracts -- two areas in which entities like the NWCDC are susceptible to abuse and areas in which the NWCDC was egregiously abused by Watkins-Brashear and others, and which have resulted thus far in four guilty pleas to criminal charges.

Am. Compl. ¶¶ 47-48.

In *Tower Air*, the Third Circuit found that "the directors' alleged rubber-stamping of major capital expenditures is consistent with bad faith." *Id.* at 240. In so finding, the court noted that directors have to make a "good faith effort to be informed and exercise judgment in discharging their duty of care." *Id., citing In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). The Amended Complaint here alleges that the required good faith effort was not made. Further, in a footnote, the Third Circuit noted that the business judgment rule "has no role where directors have either abdicated their functions, or absent conscious decision, failed to act." *Tower Air*, 416 F.3d at 238 n.13. Continuing, the Court cited with approval *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003), which held that a plaintiff may rebut the presumption of the business judgment rule "by raising a reason to doubt whether the board's decision was taken on an informed basis." *Id.* Here,

the Debtor similarly asserts that the Board essentially abdicated its functions and did not act on an informed basis, as NWCDC alleges here. Thus, this aspect of *Tower Air* also supports denial of McKoy and Booker's motion.

Other cases cited by McKoy in support of his business judgment argument are also distinguishable on substantive grounds and/or based on their procedural posture. For example, in *Green Party v. Hartz Mountain Indus.*, 164 N.J. 127, 147 (2000), after reciting the standards for application of the business judgment rule and its effect, the New Jersey Supreme Court found that the rule had limited (or no) relevance in the context of that case because the plaintiff Green Party was not involved in business dealings with the defendant shopping center, but rather with the distribution of leaflets and related activities at the mall. *Id.* at 147-48. In *Sarner v. Sarner*, 62 N.J. Super. 41 (App. Div. 1960), the Appellate Division reversed the appointment of corporate receiver after trial where there was no showing of fraud, dishonesty or incompetency by managing director. Instead, the Court found that the plaintiffs, as majority shareholders, allowed the director to run the business (successfully) for many years. Thus, the Court determined it would not interfere with the internal governance of a corporation in what was essentially a shareholders dispute and where there was an honest difference of opinion as to its management. *Id.* at 60.

Finally, in *Frost v. Adileta*, 2009 WL 4250055 (D.N.J., Nov. 24, 2009) (3:09-cv-01093), the District Court did largely affirm the Bankruptcy Court's holding that many (but not all) of the challenged activities were shielded by the business judgment rule, but that ruling was made on cross-motions for summary judgment after extensive discovery had taken place. See Bankruptcy Court Opinion, January 15, 2009, Case No. 03-02678, Dkt. No. 121, at 4, n.2 (parties consented to trial on stipulated paper record, including "extensive volumes of testimony, evidence and affidavits"). This case is in a very different setting, procedurally and substantively, as the NWCDC has had no opportunity to conduct discovery as to the quality and nature of the Trustees' actions (or inactions) and, in this Court's view, NWCDC has alleged with sufficient specificity that the Trustees violated their duties to NWCDC.

**G. <u>The Burden of Pleading (and Proof) as to Good Faith</u>**

Although both parties argue that the burden of pleading and proving good faith (or lack of it) is on the other, neither party has cited any cases directly addressing the issue in the context of N.J.S.A. § 14A:6-14 or N.J.S.A. § 15A:6-14. The Debtor points this Court to cases addressing the assertion of a "good faith" or "qualified immunity" defense brought in the context of an action under 42 U.S.C. § 1983 alleging violation of constitutionally protected right. *See, e.g., Schneider v. Simonin*, 163 N.J. 336 (2000); *Plummer v. Dep't of Corrections*, 305 N.J. Super. 365 (App. Div. 1997). These cases conclude that:

> Qualified or "good faith" immunity is an affirmative defense to a § 1983 claim alleging a violation of a federal constitutional right by a public official.

*Plummer*, 305 N.J. Super. at 370; *see also Canico v. Hurtado*, 144 N.J. 361, 365 (1995) (discussing good faith immunity defense under N.J. S.A. 59:3-3(b) ("Execution or enforcement of laws")).

In *Schneider, supra*¸163 N.J. at 359, the New Jersey Supreme Court ruled, citing *Gardetto v. Mason*, 854 F. Supp. 1520, 1530-32 (D. Wyo. 1994), that the defendant claiming the qualified immunity has the burden of proof. That reasoning is consistent with the notion that a party asserting an affirmative defense bears the initial burden of pleading and then proving it. *See* FED. R. CIV. P. 8(c) (defendant must plead any "matter constituting an avoidance or affirmative defense"). Therefore, the party bearing that burden must plead the affirmative defense, rather than the plaintiff plead its nonexistence.

Further support for this conclusion is found in the U.S. Supreme Court's decision in *Gomez v. Toledo*, 446 U.S. 635, 640-41 (1980), which also dealt with a § 1983 action. There, the Court determined that good faith is a defense peculiarly within the knowledge of defendant and is not part of plaintiff's affirmative case that a plaintiff must anticipate and plead. *Id*. The Court held that:

> *Nothing in the language or legislative history of § 1983, however, suggests that in an action brought against a public official whose position might entitle him to immunity if he acted in good faith, a plaintiff must allege bad faith in order to state a claim for relief . . .* Moreover, this Court has never indicated that qualified immunity

> is relevant to the existence of the plaintiff's cause of action; instead we have described it as a defense available to the official in question . . . *Since qualified immunity is a defense, the burden of pleading it rests with the defendant*. See Fed. Rule Civ. Proc. 8(c) (defendant must plead any "matter constituting an avoidance or affirmative defense") . . . It is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful. *We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith*. . . Our conclusion as to the allocation of the burden of pleading is supported by the nature of the qualified immunity defense. *As our decisions make clear, whether such immunity has been established depends on facts peculiarly within the knowledge and control of the defendant*.

*Gomez v. Toledo*, 446 U.S. 635, 640-41 (1980) (internal citations and footnote omitted; emphasis supplied).

Additionally, under the New Jersey Tort Claims Act, and in particular, N.J.S.A. § 59:3-3, the Court has opined:

> In many cases, the question of "good faith" presents a question of fact to be resolved at a plenary hearing . . . (citation omitted) . . . . Summary judgment under section 3-3, however, is appropriate *if public employees can establish* that their acts were objectively reasonable or that they performed them with subjective good faith . . . (citation omitted).

*Canico v. Hurtado*, 144 N.J. 361, 365 (1995) (emphasis added).

The Court finds the reasoning of these cases persuasive. There is no indication in the statute or case law that a plaintiff asserting a claim under § 15A:6-14 must plead lack of good faith or, said another way, that plaintiff must plead that the potential immunity afforded by N.J.S.A. § 15A:6-14 is inapplicable. Instead, it is an affirmative defense that needs to be pleaded and proven by a defendant, and as to which the plaintiff is normally entitled to discovery.

In sum, the Court adopts the reasoning of these cases in the context of § 15A:4-16 and holds that the NWCDC need not plead lack of good faith as part of its affirmative case. That defense must be pleaded by the defendant asserting it. The facts relevant to such a defense are peculiarly within the

defendant's knowledge and are more appropriately resolved after discovery, on a summary judgment motion or at trial.

### H. On the Current Record, Neither McKoy Nor Booker Qualify for Protection under the Charitable Immunity Act as the NWCDC Was Not Formed Exclusively for Religious, Charitable or Educational Purposes

#### (i) The General Standards for Charitable Immunity

The general standards for determining whether an entity is entitled to charitable immunity were set forth by the New Jersey Supreme Court in the *Tonelli v. Bd. of Educ.* case as follows:

> [The entity:] (1) was formed for nonprofit purposes, (2) *is organized exclusively for religious, charitable or educational purposes, and* (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works.

185 N.J. 438, 445 (2005) (emphasis supplied; bracketed language added).

Applying these factors here, NWCDC satisfies only one of three in that it is a nonprofit corporation. On this record, the Court cannot find that the NWCDC was organized "exclusively" for religious, charitable or educational purposes. Instead, it was organized to provide water to the City of Newark, through the management of its watershed, which cannot be described as a religious, charitable or educational purpose. The third factor is also facially inapplicable as the watershed was not promoting any "religious, charitable or educational purposes" when the alleged wrongdoing of the defendants -- including its Trustees -- was taking place. Instead, at best, the nonreligious, noncharitable and noneducational function of the watershed -- providing water -- was being promoted when the alleged wrongdoing occurred. That asserted wrongdoing had nothing to do with any limited recreational or educational purpose the NWCDC may have served. Thus, as is described in more detail below, charitable immunity does not apply.

#### (ii) The Parties' Arguments as to Charitable Immunity

In arguing that he is entitled to charitable immunity, McKoy recognizes that the underlying test is whether the NWCDC constitutes a "non-profit corporation, society or association organized

exclusively for religious, charitable or educational purposes." See Dkt. No. 55, McKoy Reply Br., at 8. Although the Debtor is a nonprofit corporation, McKoy does not -- and cannot -- argue that the Debtor was organized "exclusively for religious, charitable or educational purposes." In fact, McKoy acknowledges that the Debtor's assertion that "NWCDC was funded by the City of Newark to provide an essential governmental service, water," while also arguing that the NWCDC was funded by "a variety of sources and serve[d] many purposes" beyond providing water. *Id.* at 6. Thus, McKoy argues that because NWCDC received only a portion of its funding from Newark and that the balance from fees derived from environmental, recreational and educational initiatives -- its other purposes -- the NWCDC falls within the expanded definition of entities entitled to charitable immunity. *Id*. at 5.

There are several problems with McKoy's argument. First, it conflates the purposes of the entity with its funding. It is only if the entity is first determined to be formed "exclusively" for religious, charitable or educational purposes that the issue of funding may come into play. If not formed for any of those purposes, immunity simply does not apply. *See, e.g., Parker v. St .Stephen's Urban Dev. Corp., Inc.*, 243 N.J. Super. 317, 324-25 (App. Div. 1990) (nonprofit corporation formed by church to act as conduit for federal funding for housing was not formed "exclusively" for charitable purposes and therefore not entitled to immunity); *see also Loder v. St. Thomas Greek Orthodox Church*, 295 N.J. Super. 297, 301 (App. Div. 1996) ("in litigation concerning the [CIA], the focus is whether the organization is a charitable association and whether the plaintiff is a 'beneficiary' of its charitable works"). Here, accepting the allegations of the Complaint as true, the NWCDC was not formed "exclusively" or even primarily for religious, charitable or educational purposes. Instead, as noted above, it was formed to provide essential services -- water and the management of Newark's watershed -- to Newark's citizens. The analysis need go no further, as failure to satisfy the "exclusivity" requirement renders charitable immunity inapplicable, without the need to consider the funding of the entity or its functions. *Hamel v. N.J.*, 321 N.J. Super. 67, 72-76 (App. Div. 1999).

Next, any other purposes the NWCDC may have served -- which McKoy describes as educational, environmental or recreational -- were at best incidental to its primary functions, whether measured by the NWCDC's activities or its sources of funding. Am. Compl. (Dkt. No. 47-1, ¶¶ 3, 5) (describing the functions of the NWCDC); 2014 Report (Dkt. No. 1, Compl., Ex. B, at 4) ("NWCDC's two service contracts with Newark "accounted for more than 99 percent of NWCDC's income since 2008"); Hog Wild Report (Dkt. No. 1, Compl., Ex. A, at 9) ("All of NWCDC's money comes from the City").

Additionally, NWCDC was not promoting any of its alleged "charitable" functions, i.e., recreational, environmental or educational, when the wrongful activities occurred. Instead, those activities all related to the NWCDC's primary noncharitable purpose -- the provision of water and watershed management for Newark, which had nothing to do with the NWCDC's wrongful activities alleged in this action. Thus, on this motion to dismiss the NWCDC and therefore McKoy fail to satisfy two of the three *Tonelli* factors, rendering charitable immunity inapplicable.

**(iii) <u>The Cases Relied Upon by McKoy are Distinguishable</u>**

In support of their charitable immunity argument, McKoy and Booker rely principally (though not exclusively) upon two New Jersey Supreme Court decisions: *O'Connell v. State*, 171 N.J. 484 (2002) and *Ryan v. Holy Trinity Evangelical Lutheran Church*, 175 N.J. 333 (2003) in which charitable immunity was found to apply. However, these cases are distinguishable as *O'Connell* involved Montclair State University, a state-supported nonprofit entity, whose primary purpose is undeniably educational. Indeed, in *O'Connell*, which was decided on summary judgment, it was undisputed that the University was a "non-profit corporation created exclusively for educational purposes." 171 N.J. at 491. *See also Ryan*, 175 N.J. at 346 (*O'Connell* was concerned only with an entity "organized exclusively for educational purposes").

Similarly, in *Ryan*, the New Jersey Supreme Court found, after reviewing the factual record submitted at the trial court on a summary judgment motion, that Mother's Center, the nonprofit

organization operating on church premises, was formed "exclusively for educational purposes" and therefore was entitled to charitable immunity, without regard to the source of funds assessment. *Ryan*, 175 N.J. at 346-49 (source of funds analysis is required only if the claim of immunity is based on the exclusive provision of charitable (as opposed to educational or religious) services). In *Ryan,* the parties conceded that the church that allowed its space to be used by the nonprofit was formed exclusively for religious purposes. *Ryan,* 175 N.J. at 350. Other similar cases cited by McKoy are also distinguishable because they all involved entities that were found to be formed exclusively for religious, educational or charitable purposes, or that fact was undisputed. *See Morales v. N.J. Academy of Aquatic Services*, 302 N.J. Super 50, 55-56 (App. Div. 1997) (recognizing charitable immunity for nonprofit aquarium as formed exclusively for charitable and educational purposes, after discovery was completed); *Heffelfinger v. Town of Morristown,* 209 N.J. Super. 380, 391-92 (Law Div. 1985) (recognizing charitable immunity for nonprofit group that maintained public park, as formed exclusively for charitable purposes on summary judgment); *Butkera v. Hudson River Sloop Clearwater, Inc*., 300 N.J. Super. 550, 553 (App. Div. 1997) (recognizing conservation as a charitable purpose under the CIA where charitable status was not disputed).

In sum, what McKoy fails to note, and what the Court finds determinative here, is that in the principal cases he cited, the Court first found (or it was undisputed) that the subject entities were organized "exclusively" for an educational and/or religious purposes. That is not the case here. As a result, charitable immunity does not apply, without ever getting to the source of funding analysis.

In its response to the charitable immunity argument, the Debtor relies almost exclusively on the New Jersey Supreme Court's decision in *Tonelli v. Bd. of Educ.*, 185 N.J. 438 (2005), which was decided after *Ryan* and *O'Connell* (also on a summary judgment motion). There, the Court ruled that a Board of Education was not entitled to charitable immunity, even though it was formed exclusively for educational purposes, because "purely publicly funded government agencies, created to provide services to which our citizens are entitled as a matter of right, are not and have never been within the contemplation of the

Charitable Immunity Act." 185 N.J. at 449. In so holding, the Court had no trouble distinguishing its earlier decisions in *Ryan* and *O'Connell*, where the underlying entities were also found to be formed exclusively for educational and/or religious purposes, but charitable immunity was held applicable. It was only at this point, after the "exclusive" function of the entity had been determined, that the Court moved on to focus on the source of funding and the public or private (or mixed public and private) nature of the entity. As to Montclair, charitable immunity applied because it was "*not* governmentally operated" and "*not* wholly supported by public funds," but rather was funded largely by tuition and charitable contributions." Further, it did "*not* provide a service as to which our citizens are entitled as of right." *Id*.

As to Mother's Center, the private group using church space for educational purposes in *Ryan*, the *Tonelli* court found that it was "a purely private entity with no public aspects." *Id*. *Compare Parker v. St. Stephen's Urban Dev. Corp.*, 243 N.J. Super. 317 (App. Div. 1990) (not-for-profit community development corporation that sponsored low income housing with federal funding was not entitled to charitable immunity). Similarly, the Church in the *Ryan* case that provided space to Mother's Center was entitled to charitable immunity as it was organized exclusively for religious purposes and the space was provided in furtherance of its "good works." *Ryan*, 175 N.J. at 350-54.

Here, because the Court has already determined that the NWCDC was not formed exclusively for educational, religious or charitable purposes, the Court need not reach the source of funding or private/public issue. But if it were required to, the Court would find that NWCDC is certainly not a "purely private" entity based on its purposes and funding. As noted, its principal purpose is a public one -- the provision of water and management of Newark's watershed. Further, while perhaps not exclusively publicly funded, the vast majority (up to ninety or ninety-nine percent or more) of the NWCDC's funding came from Newark. For these reasons, in this Court's view, the NWCDC falls short of the "purely private" or hybrid (i.e., mixed public/private) entities that were afforded immunity in *Ryan* and *O'Connell*. To paraphrase the Supreme Court in *Tonelli*, a nonprofit entity formed to provide water

to the City of Newark that is funded principally by Newark "is simply not a charity within the meaning of the Charitable Immunity Act." *Tonelli*, 185 N.J. at 450 ("public school board is simply not a charity within the meaning of the Charitable Immunity Act"). Thus, charitable immunity does not apply to the NWCDC, McKoy or Booker.

In this regard, the Court also emphasizes that this determination is being made on a motion to dismiss, where well-pleaded factual allegations are treated as true and inferences are drawn in favor of the nonmoving party. The determination as to whether an entity is formed exclusively for educational, charitable or religious purposes is a "fact-sensitive" one which "depends on the facts and circumstances of each case." *O'Connell, supra,* 175 N.J. at 345 *citing Presbyterian Homes v. Div. of Tax Appeals*, 55 N.J. 275, 285 (1975). As was noted above, *O'Connell*, *Ryan*, and *Tonelli* were all decided on summary judgment motions, not motions to dismiss.

At best (and to the extent relevant), McKoy's arguments create factual questions as to what portion of NWCDC's revenue was derived from public sources and what portion of its functions served educational or charitable purposes. However, on this motion to dismiss, the Court is required to accept NWCDC's factual claims that more than ninety percent (or more than ninety-nine percent) of its funding came from Newark, and that its primary functions were the provision of water to Newark and management of its watershed. Thus, to the extent the Court is required to consider the primary source of funding and functions of the watershed, those sources and functions provide further support for the inapplicability of charitable immunity in this case, particularly on this motion to dismiss.

### I. <u>The Motion to Amend</u>

The NWCDC alleges that Booker and McKoy exceeded known "contractual limitations" placed on the Debtor (Dkt. No. 1, Compl., ¶ 173). Booker and McKoy argue that this claim should be dismissed for failure to meet the notice pleading requirement of FED. R. BANKR. P. 7008/FED. R. CIV. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief"). The NWCDC responds to the Defendants' notice-pleading

argument by describing the "operational contracts" which governed the NWCDC from 2006 through 2012, when Booker as Mayor allegedly had to sign an Executive Order to fund the Debtor for one more year in the face of emerging fraud allegations (Dkt. No. 47-3, Br. 9-15). The summary purports to demonstrate that the operational contracts contained no mandate for pursuing the MUA project.

NWCDC seeks leave to amend its Complaint with one "which more clearly complies with federal pleading requirements" (Dkt. No. 47-3, Br. 16). NWCDC has provided a redlined version of the proposed Amended Complaint (Dkt. No. 47-1, proposed Am. Compl.). The additions are to ¶¶ 5, 47, 116-20, 171 and 174; and primarily devoted to the description of the operational contracts and other documents that the Debtor asserts limited the Board's authority and the four guilty pleas to criminal charges that have resulted thus far. The terms of those contracts and other documents are described in further detail in NWCDC's Brief at 10-15.

FED. R. BANKR. P. 7015 and FED. R. CIV. P. 15(a)(2) instruct the Court "freely" to grant a plaintiff leave to amend a complaint "when justice so requires." FED. R. CIV. P. 15(a)(2). The Court may also deny leave to amend for "futility," if the proposed amendment still cannot state a claim on which relief can be granted or withstand a further motion to dismiss under FED. R. CIV. P. 12(b)(6). *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). "Futility" is therefore assessed under Rule 12(b)(6) standard. *In re Burlington*, 114 F.3d at 1434 (noting that the Court may grant leave to amend if dismissal is based only upon failure to plead fraud or mistake with particularity). FED. R. CIV. P. 9(b)).

In the instant case, having determined that the Complaint should not be dismissed as to McKoy, the proposed amendment is not futile because it adds specificity to the claims made against McKoy and others. Accordingly, the Court will grant the motion to amend in the exercise of its discretion and in the interests of justice.

## VI. CONCLUSION

For all these reasons, (i) Booker's motion to dismiss on grounds of public employee immunity is granted; (ii) McKoy's motion to dismiss on grounds of Safe Harbors 1 and 2 and failure to state is denied; and (iii) the Debtor's cross-motion to amend is granted Implementing Orders accompany this Opinion.

Dated: June 21, 2016

/s/Vincent F. Papalia
VINCENT F. PAPALIA
United States Bankruptcy Judge